**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-cv-01382-GPG-NRN

ANDREW SCHOBER,

                Plaintiff,

v.

BENEDICT THOMPSON, OLIVER READ,
EDWARD J. THOMPSON, CLAIRE
L. THOMPSON, PAUL READ, and HAZEL
DAVINA WELLS,

                Defendants.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THOMPSON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DOC. 78]**

---

Plaintiff Andrew Schober, by and through counsel Ethan E. Mora, of The Law Office of Ethan Mora, submits the within Brief in opposition to Thompson Defendants' Motion for Summary Judgment [Doc. 78] and states and alleges the following:

## I.      INTRODUCTION

Genuine issues of material fact remain in dispute as to when Plaintiff discovered, or reasonably should have discovered, the "source" and "cause" of his permanent and continuing torts, under Colorado law.

## II.  RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

1.       Admitted.

2.       Admitted.

3.        Admitted. Mr. Schober inadvertently sent his bitcoins to the wrong address because the Malware interfered with the copy-paste function of his computer. Only to that extent did the Malware, not a person, "intercept" his bitcoins.

4.        Admitted.

5.        Admitted.

6.        Admitted.

7.        Admitted.

8.        Admitted.

9.        Admitted.

10.        Denied. The Malware was downloaded on Plaintiff's laptop on January 27, 2018.

11.        Denied-in-part. Mr. Schober admits the "conversion" began on January 29, 2018, but the inadvertent transfer of Mr. Schober's bitcoins to the 1CZ address embedded in Malware was merely the start of the continuing "theft" of Plaintiff's bitcoins. The fact that Mr. Schober's bitcoins were transferred from a Bitcoin wallet embedded in the Malware, to a Bitcoin wallet hosted by Bitfinex, is relevant to the analysis, as it shows a pattern of conduct.

12.        Admitted.

13.        Admitted.

14.        Admitted.

15.        Admitted.

16.        Denied-in-part. What "seemed fine" was Plaintiff's computer.

17.        Denied-in-part. Plaintiff admits that documents produced by the FBI state that Mr. Schober told the FBI that on February 7, 2018 he realized that there must have been malware on

his computer affecting his copy/paste of bitcoin addresses. But Plaintiff did not "know" (at best he merely speculated) his bitcoins had been stolen by a person.

18.     Admitted.

19.     Denied. To the extent Defendants have not identified who employed or paid Benedict to conduct "end user testing," Plaintiff denies Benedict did not engage in any business activity in Colorado.

20.     Denied. To the extent Defendants have not identified who employed Benedict, Plaintiff denies that Benedict did not derive income from services rendered or activities in Colorado.

21.     Denied. To the extent Defendants have not identified who employed Benedict, Plaintiff denies that Benedict did not contract to supply services in Colorado.

22.     Admitted.

23.     Admitted.

24.     Denied-in-part. To the extent cryptocurrency addresses might be considered "bank accounts" for the purpose of this statement, Benedict maintained crypto addresses in Colorado. Ex. E – *Email from Carl Hjort to Ethan Mora, "Response to the discovery conferral letter,"* dated May 5, 2023, at p. 4 (*Edward's Suppl. Resp. to Interrog. No. 2, Set # 2*; and *RFA No. 3, Set #3*).

25.     Admitted.

26.     Denied. The law is not clear as to what "possession" of Bitcoin means. Plaintiff's position is that his bitcoins left his possession on February 25, 2018.

27.     Denied-in-part. To the extent Defendants imply that Plaintiff has calculated the full extent of his damages, Plaintiff has provided only a fair approximation of his damages.

28.     Admitted.

### III.    STATEMENT OF ADDITIONAL DISPUTED FACTS

**A. Timeliness of This Action**

1.      The West Yorkshire Police asked Mr. Schober not to contact Defendants or their families while the Police conducted its criminal investigation. Mr. Schober agreed. Ex. A – *Emails Between Andrew Schober and Joel Clayton* (West Yorkshire Police), dated Oct. 24, 2020, SCHOBER_001848 – 001857 (*J. Clayton*: "In relation to any proposed or further contact with any suspects or their families, can I please ask that this is not done whilst ever West Yorkshire Police have an active investigation."; *A. Schober*: "Understood, I will not contact the suspects again.").

2.      Throughout this litigation, Bitfinex has refused to cooperate with Plaintiff's counsel and ignored Plaintiff's subpoena requests. An attorney for Bitfinex informed Plaintiff's counsel that Bitfinex will only respond to law enforcement requests for customer information, not civil requests, because Bitfinex "does not get involved in civil matters, in particular in the United States since US courts do not have jurisdiction over us." Ex. B – *Emails Between Sarah Compani (Bitfinex) to Ethan Mora, "Urgent: Subpoena Requests to Bitfinex,"* dated Jan. 23, 2023.

3.      In addition to using several network and internet service providers, Benedict "admits that he routed his internet through another location to appear in another country." [Doc. 79 - 8] – *Benedict Resp. to RFA.* No. 9, Set #3.

4.      Defendants have been unable to produce any additional information about the "annaadmams12@gmail.com" address, yet Benedict has alluded to being "one of many individuals to use" the address. Even if multiple individuals used the same obscure email address (as strange as such a presumption would be), two things are clear: first, "Henry Burchill" did not orchestrate the theft of Ex. C – *Email from Carl Hjort to Ethan Mora, "No Expert Witnesses,"*

4

dated Apr. 10, 2023 (*C. Hjort*: "my clients do not intend to claim that Henry Burchill was the person who orchestrated the alleged theft of Mr. Schober's bitcoins.").

5.      The Thompson Defendants did not disclose their use of the Shapeshift exchange until May 2023. Ex. D – *Benedict Suppl. Response to Interrog., No. 2, Set #1*.

**B. Personal Jurisdiction**

6.      Mr. Schober has never been to the United Kingdom, and the burden on him to travel to the United Kingdom, or to litigate his claims there, would be significant for him. Ex. J – *A. Schober Decl.*, at ¶ 10.

7.      When Benedict was a minor living at home with his parents, his father, Defendant Edward Thompson, gave him authorization to perform cryptocurrency transactions "on behalf of Edward," including cryptocurrency transactions that "were simply completed by Benedict at Edward's instruction." Ex. E – *Email from Carl Hjort to Ethan Mora, "Response to the discovery conferral letter,"* dated May 5, 2023 (*Edward's Suppl. Resp. to Interrog. No. 2, Set # 2*; and *RFA No. 3, Set #3* (highlighted)).

8.      Documents produced by the FBI, obtained from Bitfinex, show that the Bitfinex user with the alias "thp2pk" controlled the "44n" Monero address and the "3CW" Bitcoin address from the same account, and the same Bitfinex user logged onto the Bitfinex platform from a device in Southampton, United Kingdom. (Ex. G – *Compilation of Discovery Selections*, p. 1 – 4).

9.      The United States and United Kingdom both have a strong interest in deterring cyber-torts, especially to the extent the tortious conduct may constitute criminal activity. Ex. F – U.S. Dept. of Treasury, "*Enhancing the US-UK Sanctions Partnership*," SCHOBER_003247 – 003249; The White House (Office of the Press Secretary), "*Fact Sheet: U.S.-United Kingdom Cybersecurity Cooperation*," SCHOBER_003250 – 003250; U.S. Dept. of Justice (Office of

Public Affairs), Press Release, "*Joint Statement by the United States and the United Kingdom on Data Access Agreement*," SCHOBER_003431.

### A.  Measure of Damages

10.      Plaintiff began purchasing bitcoins in 2014, and he would have continued purchasing between $10.00 and $25.00 per week, if not more, but for Defendants' tortious actions. Ex. H – [Redacted] *Pltf's Coinbase Transactions*, SCHOBER_002978 – 002996; see Ex. J, at ¶¶ 6, 7, 17 – 20.

11.      Mr. Schober's long-term vision was to sell his patiently-acquired Bitcoin at the right times, for him (not objectively), to help him reach is goals of buying a house, or going back to school. Id. at ¶ 7.  The exchange-rate is not necessarily the "value" of Mr. Schober's bitcoins.

12.      Mr. Schober has already spent in excess of $60,000 investigating this matter and pursuing his claims.

### B.  Expert Witnesses Not Required

13.      See Online Copy of The Malware, *available at* [link in footnote][1].

14.      Benedict logged into Bitfinex on May 17, 2017 using the IP address, 86.158.130.174. ([Doc. 79 - 5] – *Email from Bitfinex to Benedict, "Successful Login"* (showing Bitfinex login with IP address, 86.158.130.174) (Thompson000540)).

15.      The same Shapeshift customer who provided the 1Jr address (embedded in the Malware) for a transaction, also provided the 46u Monero address in the same transaction. Ex. G, *Shapeshift Records* (PDF copy), at pp. 3 - 4. The same Shapeshift customer who provided the Vanity Address for a transaction, also provided the 44n address for the same transaction. Id.

---

[1] Link to copy of the Malware: <https://hybrid-analysis**[.com]**/sample/e0d5e662bb29b62dc06e8c1c5ed07beb282ee6bb61b1fba4fb9393dd3cac4645?environmentId=100> . (Note: the brackets around ".com" need to be deleted to follow the link)

16.     The Bitfinex user "thp2pk" used his Bitfinex account to convert Mr. Schober's 16.4552 bitcoins to Monero, then "thp2pk" withdrew the Monero to the same 44n address used by Benedict. Ex. G, *FBI Records*, at pp. 1 -2.

17.     On February 28, 2017, the Github user "BenedictThompson-zz" / "benthompson2001" logged into Github using the IP address, "86.158.130.235." Ex. I – *Selected Github Records* (PDF copies) (SCHOBER_003147). On November 30, 2020, the Github user "BenThompsonCode" / "BenedictThompson" logged into Github using the IP address, "86.158.130.107." Id. (SCHOBER_003168). On January 29, 2021, the Github user "BenThompsonCode" / "BenedictThompson" logged into Github using the IP address, "86.158.130.100." Id. (SCHOBER_003167).

18.     On February 25, 2018, the Bitfinex user "thp2pk" logged into Bitfinex using the IP address, "86.158.130.134." Id. (SCHOBER_003147). Ex. G, at 5 (SCHOBER_003040).

19.     Mr. Schober is an Open-Source Intelligence (OSINT) analyst certified through the McAfee Institute who has his Open-Source Intelligence Professional Certification through the IntelTechniques. Ex. J, *Schober Decl.*, at ¶ 5. Mr. Schober spent thousands of hours of his own time on his investigation. Id*.* at ¶ 14.

## IV.     ARGUMENT

This Response In Opposition to Defendants' Motion For Summary Judgment argues: **(A)** The statute of limitations for Plaintiff's trespass to chattels, conversion, and derivative conspiracy claims is three years. **(B)** Under federal law, Plaintiff's claims began accruing no sooner than June 2019 when Plaintiff learned facts essential to show a possible "cause," or "likely source," of Plaintiff's injuries. **(C)** When citizens of a foreign nation trespass to and steal property in Colorado, from a Colorado citizen with whom the foreign tortfeasors are not in privity, the Colorado federal

court may exercise personal jurisdiction over the foreign defendants. **(D)** The measure of Plaintiff's damages is a question for the jury.

### A.    A Three-Year Statute Of Limitations Applies

A three-year limitations period applies to Plaintiff's conversion, trespass to chattels, and conspiracy claims, and in fact, Defendants previously conceded that a three-year statute of limitations applies. [Doc. 11] (Thompson Defendants' Motion to Dismiss), at p. 4 (unequivocally, Defendants declared: "'The statute of limitations for the common law causes of action is three years. See C.R.S. § 13-80-101(1)(h) (stating a three-year statute of limitations applies for "all actions of replevin or for taking, detaining, or converting goods or chattels'"). "Because statutes of limitation are in derogation of a presumptively valid claim, a longer period of limitations should prevail if two statutes are arguably applicable." *Conry v. Barker*, Civil Action No. 14-cv-02672-CMA-KLM, 2015 U.S. Dist. LEXIS 128582, at *32-34 (D. Colo. Aug. 11, 2015) (citing *Amco Ins. Co. v. Rockwell*, 940 P.2d 1096 (Colo. App. 1997).

### B.   Plaintiff Timely Filed His Conversion And Trespass Claims Were Timely Filed

"Whether the statute of limitations bars a particular claim is usually a fact question," but this issue may be decided as a matter of law "if the undisputed facts clearly show that a plaintiff discovered, or reasonably should have discovered, the injury and its cause as of a particular date." *Bad Boys of Cripple Creek Min. Co. v. City of Cripple Creek*, 996 P.2d 792, 796 (Colo. App. 2000) (citing *Mastro v. Brodie*, 682 P.2d 1162 (Colo.1984), and *Winkler v. Rocky Mountain Conference of United Methodist Church*, 923 P.2d 152 (Colo.App.1995)).[2]

---

[2] See also, CO Rev Stat § 13-80-118 (2022) ("If, when a cause of action accrues against a person, *the person is out of this state and not subject to service of process or has concealed himself*, the period limited for the commencement of the action by *any statute of limitations shall not begin to run until he comes into this state or while he is so concealed*.") (emphasis added); and CO Code § 13-80-108 (2022) ("A cause of action for wrongful possession of personal property, goods, or chattels shall accrue at the time the wrongful *possession* is discovered or should have been discovered by the exercise of reasonable diligence.") (emphasis added).

It is Defendants' burden to show when Plaintiff's claims accrued. *Focke v. Allen, No. 20-CV-03014-MEH, 2021 WL 3828714*, at \*5 (D. Colo. Aug. 27, 2021).

### 1. Defendants Were The "Source" And The "Cause" Of Plaintiff's Injuries

Defendants' position is that inanimate software code (the Malware) "caused" Plaintiff's injuries. The Malware surely played a critical role in Plaintiff's misfortune, but computer code cannot be held liable or accountable to Plaintiff for tortious acts.

Defendants' MSJ relies heavily on the colloquial use of terms like "stole" and ""cause." In turn, Defendants position (hypothetically) would hold a campfire, rather a serial arsonist, liable for burning down a house. Clearly there is a distinction between a fire that "burned a house down," and a person who "burned down a house." The Tenth Circuit recognizes this concept. A person who has been harmed by cigarettes[3], or benzene, for example, cannot sue the inanimate benzene, or the cigarettes themselves. Likewise, Plaintiff cannot sue inanimate software. To adequately make his claims, Mr. Schober must not only allege the "cause," but also the "source" of his harms.

In *Bryer v. ConocoPhillips, Co.,* 725 F. App'x 645, 650 (10th Cir. 2018), a company-defendant had been sued by an individual-plaintiff who alleged his leukemia was caused by benzene traceable to the defendant. The Tenth Circuit determined that, to adequately allege a tort claim involving both a "source" and a "cause" of the plaintiff's injuries, the plaintiff must know: **(a)** that the defendant "had been *the likely source*" of the plaintiff's injuries; and **(b)** "enough information to put him on notice that he had a cause of action against" the defendant. *Id.* (citing *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir. 1985)).

---

[3] See, *e.g.*, *Maughan v. SW Servicing, Inc*., 758 F.2d 1381, 1387 (10th Cir. 1985) (When the suspected cause is a carcinogen, "the statute must be tolled until the plaintiff knows or should know of facts supporting *the likelihood that one particular suspected carcinogen was the cause* of his cancer, and has *identified the likely source of his exposure to that carcinogen*."

Regarding Plaintiff's trespass to chattels theories, Benedict was clearly the "source" of Plaintiff's injuries; whereas the Malware was the "cause." Mr. Schober's trespass did not accrue until he traced the Malware (the "cause") to the Vanity Address (a "likely source").[4]

Also, to make a clear distinction: Plaintiff's conversion theories do not have a "source" and "cause" to allege—the two concepts are rolled into one "cause"—because the theories focus more on the wrongful deprivation, and less on the means by which the property was acquired.

### a.   Defendants Mischaracterize Plaintiff's Position On Claim Accrual

Defendants' MSJ misstates Plaintiff's position. Plaintiff's does <u>not</u> argue that his claims began accruing when he learned the "identities" of Defendants. But unlike Defendants, Plaintiff acknowledges that, particularly in digital theft cases, the plaintiff cannot "discover" his claims until he actually learns facts sufficient to adequately allege a connection between digital data (here, the Malware; the "cause"), the tortious act (the use of the Malware to steal Plaintiff's bitcoins; the "injury"), and a reasonably identifiable person (here, Benedict; the "source").[5]  The rule is not so broad to permit a plaintiff to bring claims against complete John Does, from foreign countries, without alleging at least some facts sufficient to draw a reasonable connection between a real person, and the digital identification data responsible for the tortious acts.

### 2.   Plaintiff Discovered His Conversion Claims After December 2, 2019

---

[4] To be clear, the "likely source" of the Malware was not Defendant Oliver Read ("Oliver"). At this point, the facts remain disputed as to how, and to what degree, Oliver was involved in Benedict's torts; though, to be sure, Oliver made comments about the Malware.

[5] Plaintiff's position consistent with persuasive case law addressing actions to recover concealed works of art. For example, in the Seventh Circuit, "a plaintiff cannot be said to have 'discovered' his cause of action until he learns enough facts to form its basis, which must include the fact that the works are being held by another and who, or at least where, that 'other' is." *Autocephalous Greek-Orthodox Church* v. *Goldberg*, 717 F. Supp. 1374 (S.D.Ind. 1989), affirmed *sub nom. Autocephalous Church* v. *Goldberg Feldman Arts*, 917 F.2d 278, 289 (7th Cir. 1990); see also *O'Keeffe* v. *Snyder* (1980) 83 N.J. 478 (holding that an artist's replevin action for paintings stolen 30 years earlier did not accrue until she discovered, or through the exercise of reasonable diligence should have discovered, "the identity of the possessor of the paintings").)

For his conversion claims, a plaintiff must prove that the defendant refused to return the property, despite a demand to do so. *Glenn Arms Assocs. v. Century Mortg. & Inv. Corp.*, 680 P.2d 1315, 1317 (Colo. App. 1984); *May v. United States*, Civil Action No. 17-cv-00637-RM-MJW, 2018 U.S. Dist. LEXIS 30444, at *18-19 (D. Colo. Feb. 26, 2018) (citation omitted) ("Predicates to a successful claim for conversion are the owner's demand for the return of the property, and the controlling party's refusal to return it."). Plaintiff's conversion claims began accruing, at the earliest, in December 2019, when Plaintiff demanded the return of his bitcoins from the Thompson Defendants, and the Thompsons showed him no intention of so doing.

### a. Plaintiff's Conversion Theory Is A "Continuing Tort"

"[W]here a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury." *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1430 (quotation marks and citation omitted). In *Hoery v. U.S.*, 324 F.3d 1220 (10th Cir. 2003), the Tenth Circuit distinguished between "permanent" torts and "continuing" torts: the former accrue upon the plaintiff learning of both the injury and its cause, and the latter accruing as of the last date that the tortious conduct occurred. *Hoery*, 324 F.3d at 1222. In continuing torts, "the statute of limitations does not begin to run until the wrong is over and done with." *Tiberi,* 89 F.3d at 1430.[6]

The first tortious act occurred when Benedict transferred Plaintiff's bitcoins from the 1CZ address embedded in the Malware on Plaintiff's computer in Colorado, to the 3CW address hosted by Bitfinex. Sending Plaintiff's bitcoins from the 1CZ address embedded on Plaintiff's computer, to the 3CW address hosted by Bitfinex (for its user "thp2pk"), constitutes trespass to Plaintiff's computer, and trespass to Plaintiff's private keys.

---

[6] Internal quotes and citation omitted.

Using the 3CW address to receive the bitcoins, and taking any additional wrongful acts with Plaintiff's property thereafter—*i.e.*, converting the bitcoins from BTC to Monero (XMR), and withholding, or destroying Plaintiff's bitcoins (or suitable replacement assets stemming from the exchanges)—constitute conversion. When Plaintiff's last injury occurred is a disputed fact.

### 3.   Plaintiff's Trespass Claims Began Accruing After June 2019

Until Mr. Schober discovered Benedict's Vanity Address in June 2019, (see, Ex. G, *Emails between Plaintiff and FBI*, dated June 4, 2019 (SCHOBER_000870 – 000872) (showing Plaintiff's first suspicion that Benedict may be involved); before then, Plaintiff did not know, nor could he have known the "source" of the Malware.[7]

### a.   Unlike CFAA Claims, Tort Claims Do Not Automatically Afford A Right To Seek Redress In Federal Court

In allowing Mr. Schober's conversion, trespass, and conspiracy claims to proceed, this Court's prior dismissal of the CFAA causes of action, highlights a key principle in the issue of accrual as well. Under the CFAA, claims accrue as soon as the plaintiff discovers that "someone had impaired the integrity of" his data, program, system, or information, *see Sewell v. Bernardin*, 795 F.3d 337, 340 (2d Cir. 2015).  A plaintiff bringing CFAA does not need to know anything about the perpetrator's identity, *see Sewell*, 795 F.3d at 342, as the CFAA affords plaintiffs a framework under which they can enforce rights in federal court.

Conversely, Plaintiff's state law claims do not, alone, automatically afford him a right to seek redress in this forum. And it makes sense that Plaintiff's tort claims would have a slightly longer statute of limitations period, and would begin accruing slightly later than the CFAA claims,

---

[7] At least two cases in this Circuit have recognized "possessory interests" in digital chattels. See *United States v. Ackerman*, 831 F.3d 1292, 1307-08 (10th Cir. 2016); *United States v. Sporn*, No. 21-10016-EFM, 2022 U.S. Dist. LEXIS 39070 (D. Kan. Mar. 4, 2022).

as Plaintiff must adequately plead his state law causes of action into federal court, alleging the extent of his injuries (*e.g.*, whether the property is recoverable), and the "cause" or the "source" of his injuries (*i.e.*, a connection between the injury, and personally identifiable digital data).

CFAA claims focus on when Plaintiff knew his property was damaged. Plaintiff's trespass to chattels claims focus on the degree to which Plaintiff's rights were impaired, and generally, by whom. *See, e.g.*, *Bailey v. Corr. Servs. Corp.*, No. 00-0005 JP/DJS, 2000 U.S. Dist. LEXIS 24279, at *12-13 (D.N.M. June 21, 2000) ("Allegations and determinations as to citizenship which appear illusory, requiring mere guesswork, must be dismissed.") (citing *Molnar v. Nat'l Broad. Co.*, 231 F.2d 684, 686 (9th. Cir. 1956); *Salzstein v. Bekins Lines, Inc.*, 747 F. Supp. 1281, 1283 (N.D. Ill. 1990); *Eckert v. Lane*, 678 F. Supp. 773, 775 (W.D. Ark. 1988).

### b. Equitable Tolling

"The doctrine of equitable tolling "permits courts to extend statutes of limitations on a case-by-case basis in order to prevent inequity." *Stransky v. HealthONE of Denver, Inc.*, 868 F. Supp. 2d 1178, 1181 (D. Colo. 2012) (citations omitted). Courts should apply the tolling doctrine when, as here, Defendants' conduct "rises to the level of active deception, where a plaintiff has been lulled into inaction by a defendant, or 'likewise, if a plaintiff is actively misled or has in some extraordinary way been prevented from asserting his or her rights.'" *Biester v. Midwest Health Servs., Inc*, 77 F.3d 1264, 1267 (10th Cir. 1996)).

Equitable tolling is governed by state law. *Fratus v. Deland*, 49 F.3d 673, 675 (10th Cir. 1995); *see also Wallace v. Kato*, 549 U.S. 384, 394, (2007). In Colorado, a statute of limitations may be equitably tolled "where the defendant attempts to avoid service by *placing himself beyond the power of the jurisdiction to compel attendance*, see § 13–80–118, C.R.S. (2014); and where "the defendant has wrongfully impeded the plaintiff's ability to bring the claim or *truly*

*extraordinary circumstances* prevented the plaintiff from filing his or her claim despite diligent efforts." *Malm v. Villegas*, 342 P.3d 422, 426 (Colo. 2005). The circumstances here are certainly remarkable, and would toll the statute of limitations.

Mr. Schober was extraordinarily diligent in investigating his claims. See, Ex. J, *Decl. of A. Schober*. The *March 2021 Report*—which summarizes a multi-year investigation and a joint operation between U.S. and U.K. Cyber-Crime law enforcement authorities—confirms that Mr. Schober overcame truly unprecedented barriers to identifying Benedict. He did so, through sheer dedication, seemingly well before the U.S.-U.K. law enforcement operation reached the same conclusion. Some barriers that stood in Plaintiff's way were: the Defendants' minor status, and their use of obscure aliases and various internet service providers; the active, ongoing criminal investigations, which Mr. Schober was instructed not to interfere with; and Bitfinex's unwillingness to cooperate with anyone but law enforcement. On the topic of diligence, it is also worth noting that there are many individuals named "Benedict Thompson" and "Oliver Read" in England (not to mention around the world); and yet the parties still attempt dispute whether these Defendants have knowledge of the Malware. Benedict and Oliver were not evidently connected, prior to Plaintiff's investigation—they live in completely different regions of the U.K. (about the distance from Los Angeles to Las Vegas). And Mr. Schober did not pick their names out of a hat.

Plaintiff was extraordinarily diligent in his investigation. Nevertheless, "the issue of proper diligence under Colorado law should apparently be left to a jury, . . . ." *Morgan v. Dain Bosworth*, 545 F. Supp. 953 (D. Colo. 1982).

As to fraudulent concealment, there are genuine disputes as to whether Defendants took the following actions to mask their identities and other material facts essential to form the basis of Plaintiff's conversion and trespass claims:

- The Thompson Defendants never responded to Plaintiff's letter.

- The Malware itself, which Benedict utilized, was embedded within a falsely-named, "Electrum" brand software Trojan Horse program; it clandestinely installed itself and secretly monitored Mr. Schober's computer, even after Mr. Schober had deleted the decoy program from his computer.

- Sometime between 2019 and 2021, the Thompson Defendants liquidated all of Plaintiff's stolen bitcoins and all of the suitable replace cryptocurrencies they owned.

- Benedict used proxy networks, several different internet service providers, and an anonymous "throwaway" account tied to an obscure email address and username (neither of is an apparent indication as to his identity), for the purpose of concealing connections between his online identity and his true identity.

- Defendants obfuscated the origins of Plaintiff's stolen bitcoins using a privacy-focused cryptocurrency called, Monero (and, seemingly other cryptocurrencies, like NANO), exchanging or laundering assets between each other and using their many accounts.

In sum, these actions are sufficient to constitute active deception aimed at concealing facts from Mr. Schober. See *Klamm Shell v. Berg*, 165 Colo. 540, 441 P.2d 10 (1968) (discussing the principle underlying tolling – that "one may not be permitted to take advantage of his own wrong).

### C.  The Court Has Personal Jurisdiction Over Defendants

To satisfy Colorado's long arm statute, there must be a showing that the tortious action occurred within the state and that the exercise of jurisdiction over the defendant comports with due process. *AST Sports Science, Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1060 (10th Cir. 2008). If the defendant's actions create sufficient minimum contacts with Colorado, a court then must determine whether the exercise of jurisdiction would offend "traditional notions of fair play and substantial justice." See *Int'l Shoe*, 326 U.S. at 316.

### 1.  Minimum Contacts Have Been Established

### a. Refusing Demand To Return Stolen Property Is Purposeful Availment

Minimum contacts have been established because Plaintiff's injuries occurred in Colorado. Additionally, Defendants purposefully directed their conduct at Plaintiff, and at Colorado, when Defendants refused Mr. Schober's demand that they return (or replace or reimburse) his bitcoins. Defendants intended to deprive Plaintiff of his 16.4552 bitcoins when: **(i)** Benedict used the Malware to transfer Plaintiff's bitcoins from the Malware (in Colorado, on Plaintiff's computer) to a Bitcoin wallet controlled by Benedict; and **(ii)** the Thompson Defendants first affirmatively refused to return Mr. Schober's bitcoins to him.

In *Relaximals, Inc. v. Brentwood Originals, Inc.*, Civil Action No. 19-cv-02721-MEH, 2020 U.S. Dist. LEXIS 55783 (D. Colo. Mar. 31, 2020), the plaintiff established purposeful direction and availment by warning the defendant of the Defendants' alleged IP infringement.[8] In December 2019, Mr. Schober warned the Thompson Defendants that Benedict had stolen, or at least wrongfully received, Mr. Schober's stolen Bitcoins. Defendants purposefully availed themselves of Colorado law when they ignored Plaintiff's letter and refused to return his property.

### b. Plaintiff Sustained His Injuries In Colorado

Additionally, jurisdiction over a nonresident tortfeasor requires that the injury itself occur in Colorado, even if the negligent act occurs in another state. *McAvoy v. District Court*, 757 P.2d 633 (Colo. 1988); *Sports Sci.*, 514 F.3d at 1054. In *Sports Sci.*, the Tenth Circuit found that even where tortious conduct took place in England, controlling law provides "[t]he threshold jurisdictional requirement is established when it is demonstrated . . . 'that tortious conduct in

---

[8] Many courts agree that a defendant's amenability to personal jurisdiction in the forum is not changed by the fact the defendant used the internet, and thus, was not physically present in the forum state when he committed the intentional tort. See, *e.g.*, *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998) (out-of-state defendant subject to jurisdiction where he deliberately infringed a forum-state resident's trademark subject); *Tamburo v. Dworkin*, 601 F.3d 693, 707 (7th Cir. 2010) ("Even if a website is passive or informational, if it is used to commit an intentional tort expressly aimed at a forum in which defendant knows the brunt of the injury is to be suffered, specific jurisdiction can be found.").

another state ultimately caused injury in Colorado and that requiring a defense to the tort action in
this state would be consistent with the due process of law.'" *Id.* (quoting *Fleet Leasing, Inc. v.
District Court*, 649 P.2d 1074, 1078 (Colo. 1982)). Here, both the injury and the tortious conduct
took place in Colorado. But, even if had any tortious action, or portion thereof, occurred in
England, the result remains—in favor of this Court's exercise of jurisdiction over Defendants.

Mr. Schober sustained his injuries (damage to his computer, inability to use his private
keys, and conversion of his bitcoins) in Colorado. Minimum contacts have been met.

### 2.   All Five Considerations Of Fair Play And Substantial Justice Support This Court's Exercise Of Specific Jurisdiction Over Defendants

The considerations of "fair play and substantial justice" require the Court to consider: **(1)**
the burden on the defendant; **(2)** the forum state's interest in resolving the dispute; **(3)** the plaintiff's
interest in receiving convenient and effective relief; **(4)** the interstate judicial system's interest in
obtaining the most efficient resolution of controversies; and **(5)** the shared interest of several state
in furthering fundamental social policies. *Trujillo v. Williams*, 465 F.3d 1210, 1221 (10th Cir.
2006); *OMI Holdings*, 149 F.3d at 1086. All five factors weigh in favor of this Court's exercise of
personal jurisdiction over Defendants.

*First*, Mr. Schober's burden is higher than Defendants because he has the affirmative
burden to plead his case, which would require him to bring Colorado tort claims in an English
court. Defendants enjoy the benefits of a shorter limitations period here, compared to the U.K.
*Second*, Colorado accepts bitcoin for tax payments, so Colorado has an unparalleled interest in
resolving claims related to cyber-attacks and bitcoin theft because.[9] *Third*, this Court can provide
effective relief, which would be enforceable in the U.K. as, ostensibly, a breach of contract; also

---

[9] See, Colorado Dept. of Revenue, *Crypto Currency Now Accepted For All State Tax Payments*,
https://tax.colorado.gov/cryptocurrency (accessed June 20, 2023).

the burden of forcing Plaintiff to litigate in another forum would be so overwhelming as to practically foreclose pursuit of this lawsuit. (See Ex. J., at ¶ 10.) *Fourth*, the U.S. and U.K. have a compelling joint interest in preventing the spread of Malware, digital online theft, and money laundering.[10] *Fifth*, Colorado's substantive law governs the case, and the wrongs underlying the lawsuit occurred in Colorado, which weighs in Plaintiff's favor. Personal jurisdiction is satisfied.

### D.   Measure Of Damages Is a Question Of Fact For The Jury

"The amount of damages is generally a question of fact for the jury, but summary judgment is appropriate if the plaintiff fails to establish he is entitled to damages or provide a fair approximation of those damages. *Terrones v. Tapia*, 967 P.2d 216, 218 (Colo. App. 1998)." *Palmer v. Owners Ins. Co.*, Civil Action No. 18-cv-01953-JLK, 2019 U.S. Dist. LEXIS 223534, at *16 (D. Colo. Nov. 6, 2019). Plaintiff has provided a fair approximation of his damages. See also, *Ryan v. Mineral Cnty. High Sch. Dist.*, 27 Colo. App. 63, 146 P. 792, 795 (Colo. App. 1915) (finding that the amount of damages is a question of fact for trial).

The amount of Plaintiff's damages should be left to a jury. See, *e.g.*, Ex. H – [Redacted] *Plaintiff's Bitcoin transactions (Coinbase account)*, SCHOBER_002978 – 002996.

### E.   Expert Witness Testimony Is Not Required: A Jury Would Understand Simple Ledgers, Basic Transaction And Account Records, And Online Profiles

In order to determine whether expert testimony is required to prove causation and damages, the Court "engages in a 'common-sense inquiry into whether a juror would be able to understand certain evidence without specialized knowledge.'" *Sonrisa Holding, LLC v. Circle K Stores, Inc.*, No. 17-cv-00029-STV, 2019 U.S. Dist. LEXIS 99867, 2019 WL 2471370, at *8 (D. Colo. June 12, 2019) (quoting *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014)).

---

[10] Ex. F – *Select Government Publications Regarding U.S.-U.K. Interests in Cyberspace.*

Expert witnesses are not necessary in this case because: **(i)** there is no genuine dispute as to how the Malware works; **(ii)** public, time-stamped, and immutable blockchain ledgers present undeniable connections between the Malware and two specific Bitfinex accounts; and **(iii)** discovery efforts have connected Benedict and the Bitfinex accounts to the Malware.

### 1.   There Has Never Been A Genuine Dispute About How The Malware Worked

Even if there were a genuine dispute on this issue, which there is not, the fact is not material to the parties' positions. Plaintiff alleges that, because of the Malware, he inadvertently sent 16.4552 bitcoins to the 1CZ address, embedded in the Malware on his computer. There is no dispute that Plaintiff sent his bitcoins to the 1CZ address, the reason Plaintiff sent his bitcoins to the 1CZ address in the first place is not a fact essential to prove any element of Plaintiff's trespass to chattels or conversion claims. The face speaks only to fraudulent concealment and damages issues not appropriate for resolution on summary judgment (without supplemental briefing).

### 2.   Bitfinex Users Are Linked To Malware Addresses And Monero Transactions

The Bitcoin blockchain is a reliable, open-source ledger proving the following material facts: **(a)** Plaintiff sent 16.4552 bitcoins to the 1CZ address; **(b)** the 1CZ address (embedded in the Malware) sent Plaintiff's stolen bitcoins to the 3CW address (hosted by Bitfinex for "thp2pk"); **(c)** the 1Pp address and the 1A6 address (embedded in the Malware) sent Bitcoin to the 1Gq address (hosted by Bitfinex for "JamesandJohn"); **(d)** the 1Jr address (embedded in the Malware) sent Bitcoin to the 44n address. No expert testimony is needed to show that the bitcoins from the 3CW address (linked to "thp2pk"), the 1Gq address (linked to "JamesandJohn"), and the 1Jr address (linked to a Shapeshift user connected to the Malware) were all converted to Monero.

### 3.   Benedict's Identification Data Connects Him (His Aliases) To Tortious Acts

The Bitfinex records show that, after logging into Bitfinex, the user with the alias, "thp2pk," received Plaintiff's stolen bitcoins from the 1CZ Bitcoin address embedded in the Malware—in two distinct Bitcoin transactions—both sent to the 3CW Bitcoin address, hosted by Bitfinex. Then "thp2pk" exchanged Plaintiff's 16.4552 BTC for XMR, and sent the XMR to the 44n Monero address. The Bitfinex user with the alias, "JamesandJohn," did the same thing, according to the FBI's March 2021 Report. "JamesandJohn" received bitcoins from the 1A6 and the 1Pp Bitcoin addresses, both of which were embedded in the Malware—in two distinct Bitcoin transactions—both sent to the 1Gq Bitcoin address, hosted by Bitfinex. Like "thp2pk," "JamesandJohn" then exchanged the bitcoins for XMR, and sent the XMR to a Monero address.

"JamesandJohn" and Benedict used the exact same email address, as well. The common email address, along with the similar pattern of behavior exhibited by "thp2pk" and "JamesandJohn," and the fact that Benedict's Vanity Address is connected to "thp2pk," collectively support the presumption that Benedict is both "thp2pk" and "JamesandJohn." Both "thp2pk" and "JamesandJohn" transacted with Bitcoin addresses embedded in the Malware; and both users accessed their account just once, to exchange Bitcoin (BTC) for Monero (XMR). Benedict is the Bitfinex user who engaged in online behavior identical to the behavior exhibited by "thp2pk" and "JamesandJohn." Ten digital data points indicate a common individual, Benedict, is liable.

### 4. Plaintiff Could Obtain Expert Witness Testimony (If Required)

If required, Plaintiff requests an opportunity to seek leave to expeditiously obtain written expert testimony. However, instead of experts, additional non-party records may be more useful.

## V.    CONCLUSION

For all the foregoing reasons, this Court should DENY Defendants' motion for summary judgment.

DATED this 20th day of July 2023.

**THE LAW OFFICE OF ETHAN MORA**

*/s/_Ethan E. Mora* _____

Ethan E. Mora, Esq.

1040 E. Herndon Ave., Suite 202

Fresno, CA 93720

(559) 370-1485

ethanmoralaw@pm.me

*Attorney for Plaintiff Andrew Schober*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of July, 2023 I electronically filed the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO THOMPSON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system. As such, this document was served on all counsel of record. I also served the *pro se* Defendants via email at the following addresses:

Oliver Read

    Oliverread2001@gmail.com

Hazel Wells

    Hazelwells44@gmail.com

Paul Read

    Paulread66@aol.co.uk

                                        */s/  Ethan E. Mora* _____

                                        Ethan E. Mora, Esq.